U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

2019 JAN 14  AM 11: 16

CLERK
BY _____
DEPUTY CLERK

| | |
|---|---|
| VERMONT PUBLIC INTEREST RESEARCH GROUP, SAFER CHEMICALS HEALTHY FAMILIES, LAUREN ATKINS and WENDY HARTLEY<br><br>Plaintiffs,<br><br>vs.<br><br><br>ANDREW WHEELER, as Acting Administrator of the United States Environmental Protection Agency, and the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br><br>Defendants. | Civ. No. 2:19-cv-9<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

Plaintiffs, Vermont Public Interest Research Group, Safer Chemicals Healthy Families, Lauren Atkins and Wendy Hartley ("Plaintiffs"), as and for their Complaint, allege as follows against Defendants Andrew Wheeler, as Acting Administrator of the Environmental Protection Agency ("EPA"), and the EPA:

## INTRODUCTORY STATEMENT

1. This lawsuit seeks to compel Acting Administrator Wheeler and EPA to perform their mandatory duty under sections 6(a) and 7 of the federal Toxic Substances Control Act ("TSCA") to address the serious and imminent threat to human health presented by paint removal products

1

containing methylene chloride ("MC"). Plaintiffs are two non-profit organizations committed to protecting the public from unsafe chemicals and two mothers whose sons died when using MC paint removers. They invoke section 20(a)(2) of TSCA, which provides the United States District Courts with jurisdiction to direct EPA to take actions under the law that are non-discretionary, but which EPA has failed to carry out.

2. A common ingredient in paint removers, MC is known to cause asphyxiation from acute exposure and is responsible for more than 50 reported deaths, as well as incapacitation, loss of consciousness, and coma. It also causes cancer. According to EPA, 1.3 million Americans are at risk from exposure to MC paint removers in their homes and workplaces each year.

3. TSCA section 6(a) directs EPA to ban or restrict chemicals that it determines present an unreasonable risk to human health or the environment. On January 19, 2017, EPA proposed to ban the use of MC paint and coating products distributed to businesses and consumers based on a determination that, as used in these products, MC presents an unreasonable risk of cancer, heart failure, and sudden death. At least four deaths occurred after publication of EPA's proposal. After meeting with families of MC victims, former EPA Administrator Scott Pruitt committed in May 2018 to finalize the proposed ban on MC paint removers expeditiously. He then reaffirmed this commitment in testimony to Congress and the Agency reiterated its earlier determination that MC paint removers present an unreasonable risk of injury. Yet 10 months after Mr. Pruitt's explicit vows to finalize the proposed ban, no rule has been issued and MC paint removers continue to place Americans at risk of lethal health effects.

4. EPA has thus violated the explicit command in TSCA section 6(a) that it "shall" by rule restrict a chemical determined to present an unreasonable risk of injury, applying such requirements that are "necessary so that the chemical substance no longer presents such risk."

2

5. Defendants have also violated their duty under section 7 of TSCA to protect the public against "imminently hazardous" chemical substances.

6. This Court should direct EPA to perform its duties under TSCA to finalize the MC paint remover ban and remove these dangerous products from commerce without delay.

## JURISDICTION AND VENUE

7. This action is brought under section 20(a)(2) of TSCA, 15 U.S.C. §2619(a)(2), under which "any person may commence a civil action . . . against the Administrator to perform any act or duty under this Act which is not discretionary." This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. §2619(a)(2).

8. This Court has the authority to grant the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 and 15 U.S.C. §2619(a)(2).

9. Venue is proper in the District of Vermont pursuant to 28 U.S.C. § 1391(e)(1)(C) and 15 U.S.C. §2619(a)(2) because plaintiff Vermont Public Interest Research Group is domiciled in Vermont.

## PARTIES

10. Plaintiff Vermont Public Interest Group ("VPIRG") is headquartered in Montpelier, Vermont. VPIRG is a tax-exempt, nonprofit membership organization that is incorporated under the laws of the State of Vermont. VPIRG was established in 1972 and is Vermont's largest environmental and consumer advocacy organization. VPIRG has approximately 55,000 members and supporters throughout Vermont who have been active with the organization. VPIRG's mission is to promote and protect the health and well-being of Vermont's environment,

people, and locally-based economies by informing and mobilizing citizens statewide. Ensuring the effective regulation of toxic chemicals to protect Vermont citizens from harm is a critical part of VPIRG's mission.

11. Plaintiff Safer Chemicals Healthy Families ("SCHF"), a project of Kitchen Table Campaigns, is headquartered in Washington, DC. SCHF is a nonprofit organization whose mission is to improve public health and well-being through research, analysis, public education, and advocacy. It leads a diverse coalition of 450 national, state and local groups representing over 11 million individuals united by their common concern about toxic chemicals in homes, places of work, and products. SCHF was the principal advocate for the coalition during the lengthy multi-year process to reach agreement on TSCA amendments and has been the coalition's lead voice during implementation of the new law. SCHF also directs the Mind the Store Campaign, whose mission is to work with retailers to eliminate toxic chemicals from consumer products they sell and to educate consumers on retailer programs to market safe chemical products. The dangers of MC paint and coating removal products have been a central focus of the Mind the Store Campaign and SCHF's advocacy work under TSCA.

12. Plaintiff Lauren Atkins is a mother and resident of Pennsylvania whose son Joshua died from inhaling MC while using a paint removal product.

13. Plaintiff Wendy Hartley is a mother and resident of Tennessee whose son Kevin died from inhaling MC while using a paint removal product.

14. Defendant Andrew Wheeler, named in his official capacity as Acting Administrator of EPA, has authority for the implementation of TSCA and is responsible for assuring that the Agency exercises its responsibilities under TSCA in compliance with the law.

15. Defendant EPA is an agency of the United States Executive Branch and, under the direction of Acting Administrator Wheeler, is charged with implementing the provisions of TSCA, including by promulgating rules under section 6(a) protecting the public from the unreasonable risks to health posed by chemicals such as MC.

## STATUTORY BACKGROUND

16. TSCA was enacted in 1976 to create a national program for assessing and managing the risks of chemicals to human health and the environment. Among the goals stated in TSCA section 2(b), 15 U.S.C. §2601(b), are that: (1) "adequate information should be developed with respect to the effect of chemical substances and mixtures on health and the environment" and (2) "adequate authority should exist to regulate chemical substances and mixtures which present an unreasonable risk of injury to health or the environment."

17. The need for this comprehensive framework for managing chemical risks was described as follows in the Senate Report on the original law:

> As the industry has grown, we have become literally surrounded by a man-made chemical environment. We utilize chemicals in a majority of our daily activities. We continually wear, wash with, inhale, and ingest a multitude of chemical substances. Many of these chemicals are essential to protect, prolong, and enhance our lives. Yet, too frequently, we have discovered that certain of these chemicals present lethal health and environmental dangers.

Senate Rept. No. 94-698, 94th Cong. 2d Sess. (1976) at 3.

18. To protect against unsafe chemicals, section 6(a) of the law gives EPA authority to regulate those substances that present an "unreasonable risk of injury" to human health or the environment. Section 6(a) lists several phases of a chemical's life-cycle (manufacture, processing, use, disposal, etc.) that EPA is authorized to regulate and the types of restrictions (prohibiting or limiting manufacture, use, disposal, etc.) that EPA can impose. Under TSCA

section 6(a), "[i]f the [EPA] Administrator determines . . . that the . . . use . . . of a chemical substance . . . presents an unreasonable risk of injury to health or the environment, the Administrator *shall* by rule" impose one of more of these authorized restrictions, including banning the manufacture or distribution of the chemical for a particular use. 15 U.S.C. § 2605(a) (emphasis added).

19. Despite the high hopes of Congress for effective action under section 6, progress in regulating unsafe chemicals under the 1976 law was disappointing. After a multi-year effort to overhaul and strengthen its key provisions, TSCA was amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act ("LCSA"), which took effect on June 11, 2016.

20. These TSCA amendments streamline and enhance the chemical regulatory authorities in section 6 by (1) eliminating any consideration of costs and other non-risk factors in determining whether chemicals present an unreasonable risk of injury, (2) removing the requirement for EPA to select the "least burdensome" regulatory alternative, and (3) directing EPA to impose requirements "necessary so that the chemical no longer presents such [unreasonable] risk."

21. Recognizing that EPA had issued risk assessments for MC and certain other chemicals under the old law, Congress expressly authorized EPA to use the new law to regulate these previously assessed chemicals. Section 26(l)(4) provides that, for chemicals for which EPA had published completed risk assessments before the new law took effect, the Agency "may publish proposed and final rules under section 6(a) that are consistent with the scope of the completed risk assessment for the chemical substance and consistent with other applicable requirements of section 6." 15 U.S.C. § 2625(l)(4). This provision was intended to "avoid any delay in the imposition of important public health protections that are known to be needed" based on EPA's

6

already completed risk assessments. *See* Cong. Record S3519 (June 7, 2016) (Joint Statement of Sens. Boxer, Markey, Udall, and Merkley).

22. The amended law retained with minor changes the "citizens' civil action" provisions of section 20. Specifically, section 20(a)(2) states that "any person may commence a civil action . . . against the Administrator to compel the Administrator to perform any act or duty under this Act which is not discretionary." 15 U.S.C. §2619(a)(2)

23. Under section 20(b)(2), such actions cannot be filed "before the expiration of 60 days after the plaintiff has given notice to the Administrator of the alleged failure of the Administrator to perform an act or duty which is the basis for such action." Section 20(b)(2) reduces this notice period to 10 days "in the case of an action. . . for the failure of the Administrator to file an action under section 7," which authorizes expedited judicial and administrative relief to address "imminently hazardous" chemicals.

24. Such chemicals are defined in section 7(f) as substances that present "an imminent and unreasonable risk of serious or widespread harm to health or the environment." A risk will be deemed "imminent" if injury to health or the environment is "likely" before "a final rule under section [6(a)] can protect against such risk."

## EPA RISK ASSESSMENT ON MC USE FOR PAINT AND COATING REMOVAL

25. In August 2014, EPA published a comprehensive, peer-reviewed risk assessment for MC's paint and coasting removal uses. *See* TSCA Work Plan Chemical Risk Assessment – Methylene Chloride: Paint Stripping Use, EPA 740-R1-4003 (August 2014) ("Risk Assessment"). The Risk Assessment concluded that acute (short-term) exposure to MC paint strippers presents an increased risk of "death, neurological impacts such as coma, incapacitation,

7

loss of consciousness, and dizziness; and liver effects," and that chronic (long-term) exposure to those products presents an increased risk "brain, liver, lung, and hematopoietic cancers and liver damage." In many of the use scenarios analyzed in the Risk Assessment, worker and bystander exposures to MC from paint strippers were hundreds of times greater than the margins of exposure ("MOEs") that EPA deems safe.

## PROPOSED TSCA SECTION 6(a) RULE BANNING MC USE IN PAINT AND COATING REMOVAL

26. On January 19, 2017, EPA proposed a rule banning use of MC for paint and coating removal under section 6(a) of TSCA. 82 Federal Register 7464. As proposed, the rule would prohibit the manufacture, processing and distribution in commerce of MC for all consumer and most commercial paint and coating removal applications and set stringent deadlines for implementing these prohibitions. According to the proposal, EPA's approach "is necessary so that methylene chloride in paint and coating removal no longer presents an unreasonable risk." 82 Fed. Reg. 7488. As EPA summarized these risks: "For methylene chloride, the health impacts of its use in paint and coating removal include death (due to asphyxiation), liver toxicity, kidney toxicity, reproductive toxicity, specific cognitive impacts, and cancers such as brain cancer, liver cancer, certain lung cancers, non-Hodgkin's lymphoma, and multiple myeloma. Some of these effects result from a very short, acute exposure; others follow years of occupational exposure." 82 Fed. Reg. 7466.

27. EPA's proposed rule attributed forty-nine deaths to MC since 1976, a figure which it acknowledges is an underestimate because some deaths have been unreported or mistakenly attributed to other causes. *Id.* at 7482. MC evaporates quickly upon application, giving off strong fumes that accumulate in confined spaces. *Id.* at 7475. Inhaling these fumes causes

carbon monoxide to build up rapidly in the blood, leading to heart failure, loss of consciousness, coma, and death. *Id.* at 7468, 7482. As described in a report cited by EPA:

> "'The danger posed by methylene chloride is its one-two punch when fumes accumulate. Because it turns into carbon monoxide in the body, it can starve the heart of oxygen and prompt an attack. The chemical also acts as an anesthetic at high doses: Its victims slump over, no longer breathing, because the respiratory centers of their brains switch off.'"

*Id.* at 4782 (*quoting* J.S. Hopkins, Ctr. for Public Integrity, *Common Solvent Keeps Killing Workers, Consumers*, September 21, 2015.)

28. The proposal concluded that MOEs for acute exposure risks for central nervous system effects provide inadequate protection for nearly all the occupational exposure scenarios, such that "workplaces are estimated to present exposure levels between 100 times to greater than 1,000 times more than those that are of concern." 82 Fed. Reg. 7478. As EPA emphasized, "[n]ot only workers, but also occupational bystanders, or workers engaged in tasks other than paint and coating removal, would be at acute risk for central nervous system effects (Ref. 2)." EPA further concluded that "risks of incapacitation or death are present even when respiratory protection is used." *Id.* at 7471.

29. As EPA described its findings for consumer exposure:

> "For consumers, EPA identified risks of concern for all scenarios, with some consumer scenarios demonstrating risks within the first hour of product use when paint and coating removal was conducted indoors (such as in a workshop or bathroom), regardless of whether the product formulation was brush or spray. Risks for incapacitating nervous system effects were found in some indoor scenarios (such as in a bathroom) within four hours of product use. MOEs for consumer acute risks from exposures of one hour or less ranged from 1.6 to 0.2; this equates to estimated exposures that are between six and 50 times greater than those that are expected to produce no risks of concern (Ref. 2)."

*Id.* Even residential bystanders had unacceptable risks:

> "For residential bystanders, EPA identified risks of concern for all scenarios, even assuming that any bystander in the house was not in the room where the paint and coating removal occurred. Depending on the parameters of the scenario, MOEs for acute risks

9

ranged . . . between three and 20 times greater than those that are expected to produce no risks of concern (Ref. 2)."

## MC-RELATED DEATHS OCCURING AFTER EPA'S PROPOSAL

30. Following publication of the proposed rule, at least four more deaths from MC exposure occurred. The decedents include Kevin Hartley, a 21-year-old who died of MC exposure in April 2017 while refinishing a bathtub; Drew Wynne, a 31-year-old who died in October 2017 while stripping a floor in his small business; and Joshua Atkins, a 31-year-old who died in February 2018 while refinishing his bike.

## EPA COMMITMENT TO FINALIZE MC BAN

31. After meeting with family members of Drew Wynne and Kevin Hartley – both of whom died from MC exposure after the proposed ban was published – then-Administrator Pruitt announced on May 10 that "EPA intends to finalize the methylene chloride rulemaking", "is not re-evaluating the paint stripping uses of methylene chloride and is relying on its previous risk assessments" and is "working to send the finalized rulemaking to OMB shortly." https://www.epa.gov/newsreleases/epa-announces-action-methylene-chloride. Appearing at a Senate subcommittee hearing the following week, then-EPA Administrator Scott Pruitt testified that "I recently met with individuals impacted by methylene chloride and made the decision to proceed with that [ban] by forwarding it to OMB." https://www.c-span.org/video/?445475-1/epa-administrator-pruitt-questioned-ethics-expenses (video at 33:02); *see also id.* (video at 29:05). Indeed, Mr. Pruitt said that "We have forwarded to OMB recently a proposed rule prohibiting consumer and commercial paint stripping uses for methylene chloride, following through on EPA's January 2017 proposal that methylene chloride be banned from products."

32. Since the Pruitt testimony, EPA has reaffirmed its finding that MC paint strippers present "unreasonable risks." While EPA is currently conducting a TSCA risk evaluation for *other* uses

10

of methylene chloride, in June of 2018, it specifically excluded paint removal from the scope of that ongoing evaluation because EPA has already "determined that those risks were unreasonable" and "inten[ds] to finalize" its proposed ban on such uses. EPA, Problem Formulation of the Risk Evaluation for Methylene Chloride, EPA 740-R1-7016 at 21 (June 2018).

## PLAINTIFFS' SIXTY (60) DAY LETTER UNDER TSCA SECTION 20(a)(2)

33. On October 31, 2018, plaintiffs sent the Acting EPA Administrator, defendant Wheeler, a letter under TSCA section 20(b)(2) putting him on notice of plaintiffs' intent to sue EPA to compel it to perform mandatory duties under sections 6(a) and 7 of TSCA. The letter informed defendant Wheeler that he had failed to perform non-discretionary obligations under these provisions by delaying final action to ban MC for consumer and commercial paint removal use notwithstanding the Agency's own recognition that TSCA requirements for this ban had been satisfied and the commitment of the Agency head to take expeditious action.

34. Despite plaintiffs' 60-day letter, EPA has not finalized the MC ban nearly two years after proposing the ban and 10 months after the EPA committed to issue a final rule imposing the ban and in the face of at least four deaths from MC exposure.

## FIRST CLAIM FOR RELIEF

35. Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1 through 34 as if fully set forth herein.

36. Under TSCA section 20(a)(2), this Court has jurisdiction to compel defendant Wheeler to perform any act or duty under TSCA which is not discretionary.

37. Plaintiffs' October 31, 2018 letter to defendants satisfied their obligation to notify the EPA Administrator of his failure to perform non-discretionary duties under TSCA as required by TSCA section 20(b)(2).

38. Section 6(a) provides that EPA "shall" take regulatory action upon making a determination that a chemical presents an unreasonable risk of injury and this action must assure that the "substance no longer presents such risks."

39. The extensive findings in EPA's risk assessment and proposed rule and EPA's commitment to rely on the earlier risk assessment and finalize its MC ban represent a final determination that consumer and commercial use of MC in paint removers presents an unreasonable risk of injury. EPA expressly reiterated that determination in its June MC problem formulation document.

40. Having determined that consumer and commercial use of MC in paint removers presents an unreasonable risk of injury, defendants are obligated to issue a final rule prohibiting manufacture, processing and distribution in commerce of MC for these consumer and commercial uses and must immediately carry out that duty.

## SECOND CLAIM FOR RELIEF

41. Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1 through 35 as if fully set forth herein.

42. Where a chemical is "imminently hazardous" or likely to present an unreasonable risk of serious injury before a proposed section 6(a) rule can be finalized, TSCA requires EPA to either: (1) make the proposed section 6(a) rule effective immediately upon its publication in the Federal Register or (2) "commence in a district court of the United States . . . a civil

action" under section 7(a)(2) of TSCA for the seizure of the chemical or other relief. *Id.* §§ 2605(d)(3), 2606(a)(2).

43. In addition to presenting an unreasonable risk, MC is "imminently hazardous" under TSCA section 7(f) because it presents an "imminent and unreasonable risk of serious or widespread harm to health or the environment." EPA effectively determined that consumer and commercial use of MC in paint removers is "imminently hazardous" in its Risk Assessment, which described "acute risks for neurological effects for most workers using MC]-based paint strippers," Risk Assessment at 25, and in its proposed ban, which acknowledges at least 49 sudden deaths attributed to MC exposure. 82 Fed. Reg. at 7482; *see also id.* at 7489 ("[A]dverse effects associated with methylene chloride exposure can be immediately experienced and can result in sudden death.").

44. The imminence of this hazard has been tragically confirmed by several preventable deaths since the publication of EPA's proposed ban. Additional deaths may well occur in the absence of a final rule.

45. Plaintiffs' October 31, 2018 letter gave notice to defendants of their failure to act to remove imminently hazardous MC paint removers from commerce as required by section 20(b)(2).

46. Defendants have failed to perform their non-discretionary duty to protect the public health from imminently hazardous MC paint removers and must immediately carry out that duty.

### REQUEST FOR RELIEF

WHEREFORE, plaintiffs respectfully request judgment in their favor and against defendants upon their claims and, further, request that this Honorable Court enter judgment against defendants:

(1) Declaring that defendants have failed to perform their non-discretionary duty under TSCA section 6(a) to finalize a ban on the consumer and commercial use of MC for paint and coating removal and must carry out that duty immediately;

(2) Declaring that defendants have failed to perform their non-discretionary duty under TSCA section 7 to protect the public from imminently hazardous MC paint and coating removers and must carry out that duty immediately;

(3) Ordering defendants to issue a final rule banning MC use for paint and coating removal under TSCA section 6(a) immediately and to take action under TSCA 7 to immediately protect the public from imminently hazardous MC paint and coating removers;

(4) Awarding the plaintiffs their reasonable fees, costs and expenses, including attorneys' fees, pursuant to 28 U.S.C § 2412; and

(5) Ordering such other and further relief, in law or in equity, as the Court deems just and proper,

DATED: January 11, 2019

Respectfully submitted,

/s/ Zachary K. Griefen
Zachary K. Griefen, VT Bar No. 4239
15 East State Street, Suite 4
Montpelier, Vermont 05602
(802) 223-5992 (phone)
(802) 223-0060 (fax)
zgriefen@clf.org

/s/ Robert M. Sussman
Robert M. Sussman*
Sussman & Associates
3101 Garfield Street, NW
Washington DC 20008
202-716-1118 (phone)
bobsussman1@comcast.net

*motion for admission *pro hac vice* filed concurrently with complaint

*Attorneys for Plaintiffs*